## WILL CHILDRESS et al., Respondents, v. SOUTH-WEST MISSOURI RAILROAD COMPANY, Appellant.

### Springfield Court of Appeals, January 3, 1910.

1. **PRACTICE: Continuance: Surprise by Testimony of Witness.** Where one party knows that a witness is going to be placed on the stand by the other party to give evidence, he cannot wait until the witness testifies and, if the evidence is against him, then ask for a continuance on the grounds that the witness has made statements contradictory to the testimony he had just given.

2. ———: ———: ———: **Discretion of Trial Court.** The question whether a party is entitled to a continuance on an affidavit of surprise, made during the trial, on account of a witness for the party testifying differently from what the party placing him on the stand had a right to believe he would, rests largely in the discretion of the trial court, as in the case of surprise on account of amended pleadings, and such discretion will not be disturbed by an appellate court unless it has been manifestly abused.

3. ———: ———: ———: ———. The trial court was fully justified in refusing to grant a continuance upon the application of the defendant filed after several witnesses had been examined and setting up surprise on the ground that the testimony of a witness was not the same as at a former trial, where the difference between the witness' testimony at the two trials was not called to her attention at the second trial by the appellant, and no effort was made by appellant to refresh her memory or have her testimony explained where it differed, and it was not claimed in the affidavit for continuance that other witnesses could be procured, or that the testimony given by the witness was untrue.

4. ———: ———: ———: ———. It is one of the governing rules, in passing on a motion for a continuance on the grounds of surprise by the testimony of a witness, to deny it where the court is not satisfied that a different result would likely ensue on a second trial.

5. **INSTRUCTIONS: Negligence of Defendant: Humanitarian Rule.** In the case of Krehmeyer v. Transit Company, 220 Mo. 639, the opinion declares that it is reversible error to give instructions permitting plaintiff to recover, if his injuries were due to defendant's negligence, and plaintiff is not barred by his own contributory negligence and also if plaintiff being negligent, defendant saw his peril in time to have saved him by the exercise of ordinary care, but did not. In this case three judges dissent in an opinion declaring the two positions are not antagonistic, and one judge, concurring with the three other judges, concurs only in the result; so it is difficult to determine what is the last decision of the Supreme Court on this question.

6. ———: ———: ———. Instructions in this case examined and held to submit to the jury only the right to recover under the humanitarian doctrine.

7. **STREET RAILWAYS: Duty of Motorman Towards Infants: Instructions.** An instruction, though correctly declaring the law as to the duty of the motorman in dealing with a person of mature years, held erroneous when given in a suit to recover for the killing of an eight year old child. A much higher degree of care on the part of the street railway company in the operation of its cars is required toward a child who, owing to its immature years, is incapable of realizing and appreciating the proximity of danger, and the necessity of care and caution to avoid injury.

8. ———: ———. Where a child is seen going across the street towards the track, the motorman in control of an approaching street car should slacken the speed of his car and get the same under control, with the brakes ready for instantaneous use, so that if the child without exercising the care of a grown person should attempt to cross the track, the motorman would be in a condition to at least greatly lessen the chances of collision.

9. **DEATH BY WRONGFUL ACT: Statute Imposing Penalty.** Revised Statutes 1899, section 2864, as amended by the Law of 1905, remains as before in that it imposes a penalty on one coming within its provisions, the only difference being that the penalty is any sum in the discretion of the jury within the limits provided.

10. **STATUTES: Construction.** Courts are supposed to construe laws with common sense, and to enforce them according to their intent and purpose and, if necessary to properly construe statutes, will take judicial notice of the matters of contemporary history

11. **INSTRUCTIONS: Measure of Damages: Duty to Request Proper Instruction.** When a party has neglected to ask for an instruction setting out the proper measure of damages, he cannot be heard to complain that the jury were not properly directed as to the amount of the recovery.

12. ————: ————: **Death by Wrongful Act: Penalty Statute.** It was proper to refuse an instruction requested by defendant in a suit under Revised Statutes 1899, section 2864, as amended by the Laws of 1905, which confined the jury to find a verdict only in such sum as would compensate the plaintiffs for the pecuniary loss they suffered as a result of the death of their son, for even if the statutes should be construed as partly penal and partly compensatory, the minimum amount of $2,000 would be recovered as a penalty in any case, and the jury might allow a larger sum merely as a penalty.

13. **DEATH BY WRONGFUL ACT: Penalty Statute: Excessive Verdict.** A verdict for $4000 for the killing of a child eight years old will not be disturbed where the recovery was under the penalty statute (Revised Statutes 1899, section 2864, as amended by Laws of 1905), for in such case the smallest amount allowed, where no damage is sustained, is $2000, and if the statute should be partly compensatory, an additional $2000 would not be held so large as to justify an appellate court in setting the verdict aside, especially where it comes with the approval of the trial court.

Appeal from Jasper Circuit Court.—*Hon. David E. Blair,* Judge.

AFFIRMED.

*McReynolds & Halliburton* for appellant.

(1) The trial court should have discharged the jury and continued on defendant's affidavit of surprise and application for continuance. Fretwell v. Laffoon, 77 Mo. 28; Peers v. Davis, 29 Mo. 184; Connoly v. Pehle, 105 Mo. App. 419; Albert v. Seiter, 30 Mo. App. 257; Bragg v. Moberly, 17 Mo. App. 211; 3 Am. and Eng. Cyc. of Laws, 813; Childs v. State, 10 Tex. 183; Branch v. Dubree, 55 Ga. 21; O'Connor v. Duff, 30 Mo. 599. (2) The trial court erred in its instructions to the jury in that it left the verdict to the uncontrolled discretion

of the jury. Defendants' instruction telling what facts to consider in arriving at their verdict should have been given. R. S. 1899, sec. 2864, as amended by Session Acts 1905, 135, should be construed as being compensatory instead of wholly penal. Casey v. Transit Co., 116 Mo. App. 245; King v. Railway, 98 Mo. 235, 11 S. W. 563; Coover v. Moore, 31 Mo. 574; Behan v. Transit Co., 186 Mo. 447; Stockman v. Railroad, 15 Mo. App. 583; Goss v. Railroad, 50 Mo. App. 614; Schaub v. Railroad, 106 Mo. 74; Knight v. Zinc Co., 75 Mo. App. 541; Barth v. Railroad, 142 Mo. 535.

*W. F. Maher, Hugh Dabbs, C. V. Buckley* and *R. M. Sheppard* for respondent.

(1) The evidence of the witnesses, Steltz and Waterhouse, if it had been as defendant insists it was at the first trial, would have been merely cumulative, and this would have been no ground for a continuance. Heinzle v. Railroad, 213 Mo. 102; Cytron v. Railroad, 205 Mo. 692. (2) It was necessary either to accompany the affidavit of surprise with the testimony of the witnesses taken at the former trial or an affidavit of the witnesses setting out what they swore to on the former trial. Mitchell v. Robertson, 117 Mo. App. 348; Spaulding v. City, 104 Mo. App. 45; Meisch v. Sippy, 102 Mo. App. 559; State v. McCullough, 171 Mo. 571. (3) The application for continuance, based upon the affidavit of surprise, did not state that defendant had any defense to plaintiff's cause of action, nor that the testimony of the witnesses, Steltz, Waterhouse and Ford, was untrue, nor that they had any other witness or witnesses by whom they could establish their defense; all of these facts should have been stated in order to make a sufficient application for continuance upon the ground of surprise. Boggs v. Lynch, 22 Mo. 563; Coldwell v. Dickson, 29 Mo. 227. (4) The court did not err in instructing the jury in the language of the statute as to the amount of the penalty they should

find in favor of plaintiffs nor in refusing defendant's instruction which required the jury to limit the amount of recovery to compensatory damages only. R. S. 1899, sec. 2864, as amended by the Laws of 1905; Van Housen v. Riggs, 11 Howard 461; Casey v. Transit Co., 116 Mo. App. 247; 30 Cyc., 1335, 29 Cyc., 1491; State v. Sheppard, 192 Mo. 497; Railroad v. Sullivan, 59 Ala. 272; Railroad v. Lansford, 42 C. C. A. 160; Railroad v. Shearer, 58 Ala. 672, 11 Sou. Rep. 800; Railroad v. Landers, 98 Ala. 293, 13 Sou. Rep. 57; Buckler v. Railroad, 112 Ala. 146, 20 So. 606; Railroad v. Burgess, 16 Ala. 509, 22 Sou. Rep. 913; Matthews v. Warner, 29 Grant 507, 26 Am. 396; Freuchey v. Aecleson, 43 N. E. 146; Thompson on Neg., sec. 130; Wheeler v. Boles, 163 Mo. 398; Gusman v. Elect. Co., 173 Mo. 654; Gamache v. Met. Co., 116 Mo. App. 596; Ashley v. Earley, 11 Mo. App. 79; Smith v. Fordyce, 190 Mo. 130; Potter v. Railroad, 117 S. W. 600. (5) The court did not err in giving instruction number one for plaintiffs. McKenzie v. Railroad, 216 Mo. 16; Orcutt v. Bldg. Co., 214 Mo. 51; Clark v. Cox, 118 Mo. 652; Heinzle v. Railroad, 213 Mo. 102; R. S. 1899, sec. 865.

GRAY, J.—About four o'clock p. m. on the 11th day of December, 1908, Edward Childress, the eight-year-old son of the respondents, was struck and killed by a street car of the defendant on Twentieth street, in the city of Joplin, and this action was instituted by respondents to recover from the appellant the penalty or damages provided under section 2864, Revised Statutes 1899, as amended by the Session Acts of 1905. The cause was tried before a jury resulting in a verdict in favor of the respondents for the sum of four thousand dollars, and the defendant appealed therefrom.

The petition alleged that the appellant was engaged in operating a street railroad, with double tracks, on Twentieth street in the city of Joplin; that said street was used by a large number of people, women and chil-

dren, for the purpose of traveling on foot and that such fact was well known by the appellant and its servants in charge of its cars; that it became and was the duty of the appellant to keep a vigilant lookout for persons, and particularly children of tender years who might be upon and approaching said tracks; that on the 11th day of December, while respondents' infant son was upon said Twentieth street, exercising reasonable care for his own safety, he was run over and killed by one of the appellant's cars, by reason of the carelessness and negligence of appellant's servants in managing said car, and in failing to keep a proper lookout for children, and particularly their infant son, who was approaching or on appellant's tracks. It was further alleged that the servants of defendants who were in charge of the car, by the exercise of reasonable care and diligence in keeping a lookout for children on or near the track, could and would have seen respondents' son in time to stop said car, and thereby prevented his death, but although they knew, or could have known, that said child was in a perilous situation, they failed to observe said infant, and carelessly and negligently failed to stop said car after observing him, and that on account thereof, he was run over and killed.

The answer admitted that appellant was operating its cars on the streets, and alleged that the accident was caused solely by the negligence and carelessness of said infant suddenly darting in front of one of appellant's cars when the same was so near him that it was impossible for appellant's motorman to stop the car. The reply was a general denial.

The appellant concedes that the evidence on behalf of the respondents tended to support the theory of their petition, and that the case was one for the jury. In fact, there are only three reasons urged for the reversal of the judgment, and they are as follows: First, the court erred in overruling appellant's application for a continuance made during the trial; second, that the

court erred in giving respondents' instructions No. 1 and 2; and third, the court erred in refusing appellant's instruction No. 1.

The application for continuance was filed because appellants claimed to have been surprised during the trial by the testimony of A. C. Ford, Mrs. A. J. Waterhouse, and Calvin Steltz. The evidence showed that Twentieth street runs east and west, and that Bird street runs north and south across said street, and that the next street east of Bird street is Ivy street, which also runs north and south across said Twentieth street; and that there is an alley running north and south aross Twentieth street between Bird and Ivy streets.

Ford was placed upon the stand by the respondents, and testified, on direct examination, that he was standing on Ivy street at the intersection of Twentieth street, waiting for a car which was coming from the west, going east; that he first saw the car at Bird street, and when he first saw the boy, he was leaving the alley from the north, and that after leaving the alley he started towards the tracks and got over one track and on to the other when he was struck by the east-bound car; he also testified that he did not notice that the speed of the car was slackened in any manner before it struck the boy.

On cross-examination, the witness testified that the boy was traveling in a trot and in a southeasterly direction, and was in about eight or ten feet of the car when he stepped in front of it, and that signals were given about Bird street and after. It was also shown on cross-examination that the witness made a written statement and signed it the next day after the accident, and that the same was made at the request of the appellant's representative. This written statement was offered in evidence by the appellant after the respondents had closed their case in chief, and in this state-

ment the witness stated that the car came down the street, slowly, with the bell ringing; that he did not know which side of the street the boy came from, but thought he came across the north track in front of the car.

This cause had been tried once before, but the witness Ford, was not called by either party to testify. After the introduction of this statement to contradict the witness Ford, the appellant proceeded with the trial, and called the said Mrs. Waterhouse and Calvin Steltz, and after they had testified, also called four other witnesses and examined them upon the issues in the case. After they had all been examined, an application for continuance was filed, supported by affidavit, and to which was attached the testimony of said Calvin Steltz and Mrs. Waterhouse given at the former trial. The application stated that appellant had been surprised by the testimony of Ford, Mrs. Waterhouse and Calvin Steltz; that it had in its possession the said prior statement of Ford, and relied upon him testifying as set forth in said statement; that Mrs. Waterhouse was put on the stand at the former trial by the appellant, and her testimony at said trial was in contradiction to her testimony given at the present trial, and alleging that at the former trial she testified that she heard the car whistle and saw the boy on the north side of Twentieth street, and that when the car was about even with him, he suddenly darted in front of it and was struck by the corner of the car.

The application further stated that Calvin Steltz was also a witness on behalf of the appellant at the former trial, and that his testimony then was in contradiction with that given at the time the application was made; that on the former trial, said Steltz testified that the boy ran some distance along the north track before starting across the south track.

It was further alleged that the appellant placed said witnesses upon the stand, relying upon their testi-

mony given at the former trial and conversations had with them just before placing them upon the stand, and that appellant was surprised by the evidence given by said witnesses, and asked that the jury be discharged and the cause continued, and stating· that if the same was done, appellant believed it "will be able to place its defense in this cause in such shape as to avoid the bad effects upon the defendant of the testimony given by said witnesses at this trial; that said witnesses were placed upon the stand in good faith by appellant, believing that their testimony would be the same as at the former trial."

The court overruled the application for continuance, and appellant proceeded with its testimony, after properly saving its exceptions to the ruling of the court on said application.

There is nothing in the evidence to show but what appellant knew that Ford was to be a witness in behalf of respondents, and that he had been duly subpoenaed and was there for the purpose of giving testimony to sustain respondents' cause of action. It was not shown that he had talked with any of the representatives of the appellant just prior to the time he went on the stand, and they must have known that he was going to testify to something differently from his written statement, or the respondents would not have called him as a witness unless they were deceived regarding his testimony.

It will not do to say that where one party knows that a witness is going to be placed on the stand to give evidence, that he can wait, and if the witness testifies against him, then ask for a continuance, and alleging that the witness had made statements contradictory to the testimony he was then giving. This would result in a continuance in nearly every case tried where there are any number of witnesses. The witness was not called by the appellant, and if appellant believed he would testify to the facts as set forth in his written statement, it is strange that he was not subpoenaed at the trial

to give this important evidence in behalf of the appellant.

On the former trial, the witness Steltz, on direct examination, testified that he saw the boy start to run across the street car track towards the car from the alley or sidewalk, angling across from the alley towards the car, and he ran right along the edge of the car and got where he could not see him any more; that he saw the boy across the north track, and that he was going in a trot at that time. And on cross-examination, he testified as follows: That after the alarm was sounded at Bird street, he looked out and saw the boy walking or running angling across toward the car, and this was after the alarm had been sounded away up the street. He further testified that the sounding of the alarm attracted the boy's attention and the motorman looked toward the boy, but never stopped his car, and it got so close to the boy, he could not stop it.

At the last trial, the witness, on direct examination, testified as follows: "Q. I will ask you if you saw this boy that was injured by the car? A. Yes, sir. Q. Where was he when you saw him? A. Coming out of that alley when I first seen him. Q. How far was the car from him at that time? A. I don't know just how far it was; he started towards the car, and run down along side of the car about eight or ten feet, and that was the last I could see of him. Q. You heard the signal and looked and when you heard that signal and looked to see what it meant, you saw the little boy? A. Yes, sir. Q. Came out of the alley and start diagonally across the track as though he was going to cross the track? A. Yes, sir; coming toward the car. Q. It was evident to your mind he was going in front of that car? A. Yes, sir. Q. The boy kept going towards the track and the car come down there and finally struck the boy? A. Yes, sir. Q. Going in a southeasterly direction and kept going that way, and

the car kept going east until the car, so far as you know, killed him? A. Yes, sir."

And on re-direct examination: "Q. Did you see which track he traveled on? A. No, he was off the track. He run down the track a little piece, and then got right up next to the car and I couldn't see nothing of him. Q. Which track did he run down? A. The north track. Q. How far did he travel on that track? A. Must have been five or six feet before he left it. He got off that and run towards the car. Q. When he was on that track, which direction was he traveling? A. Toward the car." If there is any substantial difference between the testimony of the witness given at the two trials, we wholly fail to discover it.

On the first trial, Mrs. Waterhouse testified that when she first saw the boy he was right on the track with his back to the north, and the car was coming on; that she thought he was looking toward the car and stooped down to pick up his book and that she looked again and it looked like he was moving across the track, but that he did not get to the middle of the track until the car struck him; that he was just walking right across the track and the car was coming down and he did not make any effort to get away.

On the second trial the witness testified, on direct examination, that when she first saw the boy he was coming down the track looking toward the car, and it looked as though he had crossed the north track and was right on the other track when the car whistled him off and it looked as though he was going to cross right in front of the car.

On cross-examination, the witness testified as follows: "Q. The car kept coming down the street and this little boy kept crossing in front of the car? A. Yes sir. Q. He stayed right on the track? A. Yes, sir. Q. Stayed on the track even after the car got to Bird street? A. Yes, sir." The witness testified at the first

trial that she saw the boy hit and at the second trial that she did not.

It is not shown that the difference between the witness' testimony at the two trials was called to her attention at the second trial by the appellant, and no effort was made by appellant to refresh her memory or have her testimony explained wherein it differed. It is a well known fact to every practitioner that it is seldom that the testimony of a witness at different trials is just the same. The stenographer may make a mistake in taking down the testimony, and the witness, not being accustomed to the court room, is more or less confused, and it is not strange that the testimony is not always the same.

The question whether a party is entitled to continuance on an affidavit of surprise after pleadings have been amended, rests largely in the discretion of the trial court, which discretion will not be disturbed by an appellate court, unless it has been manifestly abused. [Eastin v. Joyce, 85 Mo. App. 433.] We believe the same rule should apply as to applications for continuances on an affidavit of surprise, made during the trial, on account of a witness for the party testifying differently from what the party placing him on the stand had a right to believe he would.

This cause had been once tried, and there were but few eye-witnesses to the accident, and undoubtedly all these were witnesses on one side or the other. It is one of the governing rules in passing on such a motion, to deny it, where the court is not satisfied that a different result would likely ensue on a second trial. [Bragg v. City of Moberly, 17 Mo. App. 221; 1 Haynes' New Trial, par. 85.]

It was not claimed in the affidavit for continuance that other witnesses could be procured, or that the testimony given by the witnesses was untrue, but the appellant simply stated: "The defendant believes that if the jury is discharged and the defendant given a contin-

uance in this cause, that at the next term of the court the defendant will be able to place its defense in this cause in such shape as to avoid the bad effects upon the defendant of the testimony given by said witnesses at this trial." The trial court did not abuse its discretion in overruling the application.

The complaint lodged against instructions 1 and 2, is made in the following language: "The appellant contends that plaintiffs' instructions Nos. 1 and 2, are in conflict, and the circuit court committed reversible error in giving both of said instructions, as one authorizes the jury to find for the plaintiff on the ground of negligence of defendant without any negligence on the part of the plaintiffs and asks finding for the plaintiff on the so-called humanitarian or last chance doctrine."

The Supreme Court in Krehmeyer v. Transit Co., 220 Mo. 639, 120 S. W. 78, in an opinion by WOODSON, in which Judges Fox and BURGESS concur, declared the position of appellant to be right, and that it is reversible error to give instructions permitting plaintiff to recover, if his injuries were due to defendant's negligence, and plaintiff is not barred by his own contributory negligence, and also if plaintiff, being negligent, defendant saw his peril in time to have saved him by the exercise of ordinary care, but did not. Judge VALLIANT wrote a dissenting opinion, in which GANTT and LAMM, Judges, concurred, declaring that the two positions are not antagonistic, and that instructions submitting both theories are proper. It is claimed, therefore, that this case is authority and settles the doctrine in this State in favor of the law as declared by Judge WOODSON. Judge GRAVES wrote a separate concurring opinion, in which he states: "I concur in the result reached by my brother WOODSON, but for reasons somewhat different, that is to say, I do not follow all of his reasons." If he did concur with WOODSON, he has since changed his mind.

In Spencer v. Transit Co., 121 S. W. 108, Judge GRAVES wrote the opinion. In that case instructions

were given submitting both issues and among these in-
structions is the following: "If the jury find from the
evidence that Mrs. Spencer took the same degree of care
of the child on the occasion in question as a reasonably
prudent person ordinarily would under the same or sim-
ilar circumstances, then she was not guilty of such con-
tributory negligence as would defeat this action; and
even if the jury believe that she did not exercise reason-
able care and that the child escaped from her grasp and
ran across the railroad track, as shown in the evidence,
yet this would not defeat plaintiff's recovery, if you be-
lieve that the motorman, without seeing the child either
on the track or moving toward it, and on the first ap-
pearance of danger of such child, failed to stop the car
within the shortest time and space practicable consist-
ent with safety of the passengers on board the car, and
that such failure by said motorman occasioned the death
of said child."

Speaking of this instruction, Judge GRAVES said:
"We see no error in this instruction. It reiterates the
well-recognized humanitarian rule."

If the decision of this case hinged upon this ques-
tion, we would be at a loss to know what to do. What
is the last decision of the Supreme Court upon the sub-
ject? We have an opinion by three judges, dissented
from by three judges, and one judge concurring in doubt
and a subsequent opinion by him declaring the law as
found in the dissenting opinion. This point is a very
material one, and is in nearly every case wherein dam-
ages are sought to be recovered from a street car com-
pany by injuring a child in the street, and it is to be
regretted that the judges of the Supreme Court are un-
able to agree on a clear and well defined declaration of
the law relating thereto.

We do not believe the instructions complained of
are subject to the construction placed upon them by ap-
pellant. The parts of the instructions necessary to be
determined, are as follows: "No. 1. And if you further

find from the evidence that at the time above mentioned, said Edward Childress exercised such care and caution for his own safety as a reasonably prudent child of his age and capacity would have exercised under the same or similar circumstances, and that defendant's motorman and servant in charge of and operating said car, either saw or by the exercise of ordinary care on his part could have seen said Edward Childress moving toward and upon said track in a perilous position in front of said car, and if you so find, in time to check the speed of said car with safety to its passengers and to have avoided running against and injuring said child; if you find such were the facts and that said servant and employees of defendant neglected and failed to do so, and that such failure, if any, directly and approximately caused the death of said child, then your verdict will be for the plaintiff."

Instruction No. 2. "The court instructs the jury that although you may find and believe from the evidence, that the defendant's motorman on its car mentioned in evidence, sounded the gong, rang the bell or blew the whistle attached to the car, or did all these things and used any or all of the ordinary danger signals in order to attract the attention of the boy, and although you may further find from the evidence in this case, that the boy was guilty of negligence in going on the track of defendant at the time and place he was killed, yet if you further believe from the evidence that defendant's motorman in charge of said car, saw or by the exercise of ordinary care could have seen the child on defendant's tracks, or approaching thereto, with the evident intention of entering thereon or crossing it, in time to have stopped his car or so slackened its speed as to have prevented the injury of said child, and failed to do so and on account thereof the child was struck and killed by said car, then you should find the issues for plaintiffs."

In our opinion these instructions submitted noth-

ing to the jury but the right to recover under the humanitarian doctrine. Instruction No. 1 would have been good without the reference therein in regard to ordinary care on the part of the boy. [White v. Railroad, 202 Mo. l. c. 561, 101 S. W. 14:] In that case the court said: "But further, there is no merit in the assignment of error now in hand, because there was only one ground of negligence to put to the jury. It will be seen that the case was put to the jury on the sole theory that defendant was liable only if by due care and diligence it could have stopped its car in time to avoid the injury to deceased after he appeared to be in danger."

The court gave the following instruction in behalf of the appellant: "The court instructs the jury if they believe from the evidence that the motorman in charge of defendant's car just after crossing Bird street, saw Edward Childress come out of the alley between Bird and Ivy streets, and immediately sounded a warning with the whistle, and said Edward Childress started east on the north track, then the motorman had the right to presume that the said Edward Childress would keep on the north track until said car passed him, and had the right to let his car go forward at the ordinary and usual rate of speed for that place, and if the jury further believe from the evidence that when the motorman discovered, or by ordinary care could have discovered, that Edward Childress was going to attempt to cross the south track in front of the car, the car was so close to said Edward Childress that the motorman, with the appliance at hand and the use of ordinary care, was unable to stop said car in time to prevent it striking said Edward Childress, then your verdict will be for the defendant."

This instruction is not the law of this case, and should not have been given. It correctly declares the duty of the motorman in dealing with a person of mature years. A much higher degree of care on the part of a street railway company in the operation of its cars is

required toward a child, who, owing to its immature years, is incapable of realizing and appreciating the proximity of danger, and the necessity of care and caution, to avoid injury, than is required toward grown men and women who have knowledge, experience and mature years to better enable them to look out for themselves.

This instruction was based on the testimony of the motorman, who testified that when he was at Bird street, he saw the little boy come out from the alley and start in a southeasterly direction across the street; that he sounded the warning and the boy turned east on the north track, and he continued to run his car, relying upon the boy not attempting to cross the south track, but when he got so close he could not stop his car, the boy turned and started across the track.

It is not necessary to the decision of this case, to comment upon this instruction, but if the men operating street cars believe that such is the law, they should be otherwise instructed, or cases of this character will be numerous, indeed, in the courts of this State. The testimony showed that a schoolhouse was located just two blocks north on Twentieth street, and that it was attended by children living on or near Twentieth street; that the accident happened at four o'clock in the afternoon, just at the time the children were returning from school, and if this motorman saw this child with his schoolbook in his hand, he undoubtedly must have known that he was a mere child, skipping along the street, homeward bound from school.

In 2 Thompson on Negligence, sec. 1424, it is said: "The degree of care which the law demands of the street railway company, especially where it makes use of an underground cable or of an electric wire for the propulsion of its cars, is, no doubt in legal strictness, defined by the words 'ordinary care.' But the use of this expression, in instructing a jury, would obviously mislead them, in the absence of further explanation, by leading

them to suppose that the street railway company discharges its duty to children on the streets by extending to them the care which ordinary persons use under ordinary circumstances. Such is not the law. The law will, for example, demand greater care and vigilance in running an electric car over a public street crossing which is much frequented by children going to and returning from school, at a time when they may reasonably be expected to be using the crossing, than is demanded at other places. As young children are notoriously less capable of caring for themselves than adults are, the law demands of such a company greater vigilance and caution in keeping its car well in hand and in controlling its movements so as to prevent injury to small children, than it demands in the case of adults."

This declaration of law is cited by our Supreme Court with approval in Hovarka v. Transit Co., 191 Mo. 441; 90 S. W. 1142; and in Cornovski v. Transit Co., 207 Mo. l. c. 274, 106 S. W. 51, it is said: "If Esther had passed the years of infancy and was arriving at the years of judgment and sense, then unless the motorman saw she was bent on crossing the track, and was oblivious to her danger, it would have been error to assume that she was in danger from the time she left the curb until she reached the track. Now the sidewalk of the streets is for foot travel—children and grown. Between the curb is for traffic; there horses, wagons and cars pass to and fro, and the wheels of commerce go clattering and roaring round and round. Our very instincts teach us that when a four-year-old child, unattended, leaves the curb of a sidewalk, and heads across the street, devoted to traffic in a great city, with a car track twelve feet away on which a car is approaching, the little one as surely and instantaneously plunges into danger as that the square of the hypotenuse of a right-angled triangle equals the sum of the squares of the other two sides. Danger to the child and duty on the

motorman's part began the instant such a child left the sidewalk, bound headlong for the track."

In Cytron v. Transit Co., the child killed was eight years of age. The accident happened by a street car killing the infant on a public highway, and that the motorman saw, or could have seen the child coming across the street in the direction of the car track. And in that case the court said: "Both danger and duty began the instant the child left the sidewalk, bound headlong into peril."

And so in the case at bar, the motorman saw this boy when he was one hundred and fifty feet west of the alley, and he saw the boy going in a southeasterly direction, so that he was afraid that the boy might reach the south track the same time the car did and be killed, and he gave him a warning. And then the instruction declares if this was done and the child turned east on the north track, all duty on the part of the motorman then ceased until the motorman saw that the child was going to cross the south track, at which time it must have been apparent to any one that it would likely be too late to save his life. The law required of the motorman to get his car under control, so that if this child should attempt to cross the south track and drop his school book (as he did) and stop to pick it up, he would not be killed. In other words, when the motorman saw this child leave the alley and start across the street in a southeasterly direction, he should have slackened the speed of his car and got the same under control with the brakes ready for instantaneous use, so that if the child without exercising the care of a grown person, should have attempted to cross the track, that he would be in a condition to at least greatly lessen the chances of collision. The instructions were favorable, indeed, to the defendant, and so much so, that if it had recovered a verdict from the jury, a new trial should have been granted.

This brings us to the third and important point in

this case. In behalf of plaintiffs, the court told the jury if the verdict was for the plaintiff, "you will assess plaintiffs' damages at a sum not less than $2000 and not exceeding $10,000, in your discretion." The appellant asked the following instruction on the measure of damages: "The court instructs the jury if you find for the plaintiffs, you are only entitled to find such damages as will compensate them for the pecuniary loss they may suffer as a result of the death of their son, Edward Childress. In assessing their damages, you may take into consideration the expense of caring for said child and his burial after the injury; also the value of the child's services during his minority, less the expense of its maintenance and support during that time. The plaintiffs are not entitled to recover any damages on account of the loss of the society of their minor son, Edward Childress, or anything on account of pain, anguish or grief suffered by reason of his death, but your verdict shall be not less than two thousand dollars." This instruction, the court refused.

This suit is based on the amendment of 1905 to section 2864 of our Damage Act, and the question is, whether the court should give instructions telling the jury what things should and should not be taken into consideration in determining the amount of the verdict. This statute has not been construed by the Supreme Court, but in Potter v. Railroad, 117 S. W. 593, the St. Louis Court of Appeals, while declaring as follows: "We do not express any opinion as to whether it is proper for the court, under the amendment to section 2864, to endeavor to control the jury as to the amount, any further than that they are to be kept within the limits fixed by that section as amended," yet the court did express an opinion as follows: "In the first place, the statute itself fixes a penalty for causes in which death results from the fault or negligence of the defendant at the sum of not less than $2000 and not exceeding $10,-000 'in the discretion of the jury.' " We do not think

that this changed the law as it existed before, any further than that, instead of a fixed sum, as provided in section 2864, before the amendment, the sum authorized by the amendment is a sliding or variable one; that sum left to the discretion of the jury, and the court is no more vested with power by this section, to fix the amount at $2000 in any case than it is authorized to sustain a verdict for an amount in excess of $10,000. Section 2864, as amended in 1905, remains as before, in that it imposes a penalty on one coming within its provisions, the only difference being that the penalty is any sum in the discretion of the jury, within the limits provided."

The constitutionality of the act is not challenged, and if it were, we would have no authority to pass upon it. We are, therefore, to accept the statute as amended, as the law of this State. Prior to the amendment of this statute, the courts held that a recovery under the statute must be for the exact sum of $5000 no more or no less. [Casey v. Transit Co., 116 Mo. App. 235, 91 S. W. 419; s. c., 205 Mo. 722, 103 S. W. 1146.]

In Casey v. Transit Co., 116 Mo. App. 235, we find this: "In full accord with this well-established doctrine that a statute may be both remedial and penal, our Supreme Court, in the later, and it seems to us the better considered cases, has repeatedly held that this statute is one of that class, both remedial and penal; remedial in so far as its purpose is to provide compensation to the immediate relatives, and penal in so far as by its terms, it inflicts a penalty or forfeiture for every wrongful death thereunder, whether the person killed be a kind and good husband and father, of large expectancy of life and extraordinary earning capacity, or whether he be a vagabond and a curse, mean, contemptible and cruel to his family, and one who, instead of providing therefor, leads the life of an indolent drone, revelling in vice and crime, consuming the sustenance of his wife and children; and penal, too, because of its object and purpose to deter and punish the wrongdoer for

the wrongful death of any citizen whether he be good or bad."

In King v. Railroad, 98 Mo. 235, 11 S. W. 563, the following will be found: "That amount is allowed in the cases therein specified for a twofold purpose, first, compensation, and second, as a penalty to protect the public against repetitions of like wrongs." Again, in the case of Philpott v. Railroad, 85 Mo. 164, we find the following: "The statute is remedial and is designed to be compensatory in part. But it is more than this. The case at bar demonstrates the fact that it cannot be wholly compensatory; for the amount of the recovery being fixed, as it is, it is altogether out of proportion to the value of the services of the son for the remainder of of the period of his minority. The law is also designed to guard and protect persons against the wrongful acts thereby prohibited." In Senn v. Railroad, 124 Mo. 625, 28 S. W. 66, we find this expression: "The party guilty of the wrongful act of neglect, is made liable by the statute, to forfeiture, and pay for such death to the person entitled to sue therefor, the sum of $5000. The amount of the damage is thus fixed, and no greater or less amount can be recovered."

The old act read: "Shall forfeit and pay for every person or passenger so dying, the sum of $5000." The amendment reads: "Shall forfeit and pay as a penalty for every such person, employee or passenger so dying, the sum of not less than $2000, and not exceeding $10,-000 in the discretion of the jury." Section 4160, Revised Statutes 1899, requires courts to construe words in their plain, ordinary and usual sense. And courts are not to look for obsolete and remote definitions. [State v. Miller, 182 Mo. 370, 81 S. W. 867.] And courts are supposed to construe laws with common sense, and to enforce them according to their intent and purposes. [State ex rel. St. Louis, 174 Mo. 125, 73 S. W. 623.]

As we have above stated, when the act read, "shall

forfeit and pay," the court held the money sued for was a penalty and not ordinary damages, and the question of pecuniary damage was foreign to the case. If the old section was to be so construed, how much stronger is the new when it reads: "shall forfeit and pay as a penalty in the discretion of the jury." The authority for the Legislature to enact the old statute is in the police power of the State, and is built upon the solid rock of public policy in which the State is an interested party, to the end that the lives of its citizens shall not be negligently sacrificed by those operating railroads and other dangerous conveyances of a public nature, and under franchises, an authority granted to them to serve the public. [Philpott v. Railroad, 85 Mo. 164.]

The court will take judicial notice, if necessary, of the facts of contemporary history, in order to properly construe the statute. [State v. Bengsch, 170 Mo. 1. c. 111, 70 S. W. 710.] It is a matter of history, that at the time this amendment was passed, an effort was being made to make the penalty $10,000 in all cases, instead of $5000, and the act as finally passed, fixed the sum at not less than $2000 or more than $10,000, and in order to preserve the strictly penalty feature of the old law, and for fear it might be held that the same had been destroyed, the words "penalty" and "in the discretion of the jury" were added.

It is said that it was not the intention of the Legislature to leave the jury at liberty to roam through the fields of speculation and sympathy in arriving at a verdict, and that such discretionary powers in the jury should not be left without special control by the court under proper instructions. In the more important matter of the liberty of the citizen, the extent of the punishment is left in the sound discretion of the jury. In a criminal case where the punishment is not less than two or more than ten years in the penitentiary, the court does not attempt to tell the jury what things

141 App.—44

should be considered in fixing the extent of the punishment.

Indeed, the Legislature of this State, in 1907, provided that in cases of murder in the first degree, it shall be left in the discretion of the jury whether the convicted shall suffer death or be confined in the penitentiary for life.

We have been favored with able briefs upon this point by both parties, and a number of authorities have been cited from other States, but an examination of them shows that they are based upon special statutes of those States, and therefore, do not clearly interpret the statute under consideration. But as we study the statute from its language and surrounding circumstances, we do not believe there is much doubt concerning its proper interpretation.

We understand that cases involving the proper construction of this statute are now before the Supreme Court, and we might hesitate to affirm this judgment at this time, in view of this fact, if the point was decisive of this case, but our Supreme Court holds that when a party has neglected to ask for an instruction setting out the proper measure of damages, he cannot be heard to complain that the jury were not properly directed as to the amount of the recovery. [Geismann v. Elec. Co., 173 Mo. 654, 73 S. W. 654.]

The instruction in this case given in behalf of respondents, has been held sufficient in a case under this statute. [Potter v. Railroad, 117 S. W. 563.] The instruction asked by the appellant confined the jury to find a verdict only in such sum as will compensate respondents for the pecuniary loss they suffered as a result of the death of their son. This instruction is manifestly wrong under any construction of the statute as amended, even though we adopt appellant's construction thereof, to-wit: "that it is partly penal and partly compensatory." The penalty part of it is not less than $2000 in any case, and the instruction should tell the

jury that a recovery of not less than $2000 should be had as a penalty, whether there was any actual damage or not, and in addition to that sum, the pecuniary loss also allowed.

In determining the amount to be allowed as a penalty, the jury would have the right to take into consideration, all the circumstances of the accident, and allow such sum as a penalty as they should believe to be just and right for the taking of the life of a child in the manner, and under the circumstances in which it was done. The court, for the reasons above given, was justified in refusing the instruction asked by the appellant.

It is claimed that the verdict is excessive, and we have been cited to several cases in which verdicts in such sums for the death of children of about the same age, have been held excessive, but they were all cases in which the plaintiffs were limited in the amount of their recovery to the pecuniary loss sustained. In this case, the smallest amount allowed, even though no actual damages are sustained, is $2000, and a verdict for $2000 in an ordinary action for damages, prosecuted by the parents for the death of a child of a similar age, would not be held so large as to justify an appellate court in setting aside the verdict when it comes with the approval, not only of the triers of the fact, but the trial court as well.

After a careful consideration of all the questions raised on this appeal, we have come to the conclusion that the judgment should not be disturbed, and it is accordingly affirmed. All concur.